IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARIBEL LOPEZ-MENDEZ,

    **Plaintiff**,

       **v.**

LEXMARK INTERNATIONAL, INC.,
et al.,

    **Defendants.**

**CIVIL NO.** 08-1521 (FAB)

**OPINION & ORDER**

BESOSA, District Judge

    Pending before the Court is defendants' motion for summary judgment and defendants' motion to strike plaintiff's statement of material facts. (Docket No. 50; Docket No. 66)  Having considered the arguments contained in defendants' motions, plaintiff's oppositions, and defendants' replies, the Court **GRANTS** both the motion to strike and the motion for summary judgment.

**DISCUSSION**

I.  **Background**

    A.  **Procedural Background**

      On May 5, 2008, plaintiff Maribel Lopez-Mendez ("Lopez" or "plaintiff") filed a complaint alleging discrimination and retaliation claims against Lexmark International, Inc. ("Lexmark"), Jairo Fernandez ("Fernandez"), Ruben Colon ("Colon"), Luis Viloria ("Viloria"), and Antonio Diaz ("Diaz").  (Docket No. 1 at ¶¶ 2.1-2.6)  Plaintiff's claims are brought pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-15, the Equal Pay Act ("EPA"), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, Puerto Rico Law 100 ("Law 100"), P.R. Laws Ann. tit. 29, §§ 146-151, and Articles 1802 and 1803 of the Puerto Rico Civil Code ("articles 1802 and 1803"), P.R. Laws Ann. tit. 31, §§ 5141, 5142.  (Docket No. 1 at ¶¶ 1.1-1.2)

In a June 23, 2009, opinion and order, the Court dismissed plaintiff's claims against individual defendants pursuant to Title VII, the ADEA, the EPA, and Law 100.  <u>Lopez-Mendez v. Lexmark Int'l, Inc.</u>, 627 F.Supp.2d 66 (D.P.R. 2009).[1]  In the same opinion and order, the Court also dismissed any claim by plaintiff for mental anguish or emotional distress based on the EPA or the ADEA and plaintiff's separately plead claim for intentional infliction of emotional damages.  <u>Id.</u>  The Court clarified that plaintiff may, however, present evidence of intentional infliction of emotional damages as part of her claim pursuant to articles 1802 and 1803.  <u>Id.</u>

On September 23, 2009, defendants filed a motion for summary judgment arguing that:  (1) plaintiff cannot provide sufficient evidence, either direct or circumstantial, of discriminatory animus to maintain her claims under Title VII, the ADEA, or Law 100 based on her termination; (2) plaintiff's claim of

---

[1] This opinion and order, (Docket No. 40), adjudicated a motion for judgment on the pleadings filed by defendants. (Docket No. 28)

age and sex discrimination based on an alleged failure to promote is untimely; (3) plaintiff does not satisfy the necessary elements for a *prima facie* case of failure to promote, even if plaintiff's discrimination claim on that basis is timely; (4) plaintiff cannot establish that her termination was retaliatory; (5) plaintiff cannot establish the necessary elements to prevail on her hostile work environment discrimination claim; (6) Lexmark is entitled to the affirmative defense established in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998); and (7) plaintiff cannot establish the necessary elements of a *prima facie* case under the EPA. (<u>See</u> Docket No. 50.)

On November 6, 2009, plaintiff filed an opposition to the motion for summary judgment. (Docket No. 59)  Rather than helpful legal analysis specifically responding to the arguments raised by defendants, plaintiff's opposition consists primarily of material copied and pasted from the "Additional Facts" section of her statement of material facts. <u>See id.</u>  Plaintiff also relied on vague generalizations asserting that there are genuine issues of material fact regarding the pretextual nature of defendants' nondiscriminatory reasons for actions taken toward plaintiff. <u>See id.</u>  In short, plaintiff did little more than repeat facts that, pursuant to Local Rule 56(c), should properly be listed in her statement of material facts, and invite the Court to complete her

task of using those facts to demonstrate the existence of genuine issues of material fact sufficient to survive summary judgment.

On November 16, 2009, defendants filed a motion to strike plaintiff's statement of material facts for failure to comply with Local Rule 56, arguing that plaintiff failed properly to respond to defendants' statement of material facts filed in conjunction with their motion for summary judgment. (Docket No. 66) On December 10, 2009, after being granted two extensions of time, plaintiff filed an opposition to the motion to strike arguing that she identified "with specificity the issues of fact which are contested," and that "even deeming admitted defendants' statement of facts, there are material controversies of issues of facts [sic] . . . substantiated by [her] Statement of Additional Facts, with specific citations to the record."[2]  (Docket No. 82)

**B.   Plaintiff's Failure to Comply with Local Rule 56**

Local Rule 56(c) requires a non-moving party to file with its opposition "a separate, short, and concise statement of material facts" which shall "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's

---

[2] The Court references the extensions of time granted to plaintiff to file her opposition due to the gross inadequacy of that opposition, which will be addressed in greater detail later in this Opinion and Order.  The Court expects extensions of time to be requested when such an extension will allow a party adequately to prepare a document useful in resolving a pending legal issue.  If a document filed after an extension of time is not adequately prepared or useful, the additional preparation time granted, not to mention valuable judicial resources, is wasted.

statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule." Local Rule 56(c) also requires that, if the nonmoving party includes any additional facts, those facts must be in a separate section, set forth in separate numbered paragraphs, and be supported by a record citation.

The First Circuit Court of Appeals has "repeatedly . . . emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Caban Hernandez v. Phillip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is- and what is not- genuinely controverted.'" Id. (quoting Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)). Due to the importance of this function to the summary judgment process, "litigants ignore [such rules] at their peril." Id.

Where a party does not act in compliance with Local Rule 56, "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." Id. (citing Cosme-Rosado v. Serrano-Rodriguez, 360 F.3d 42, 45 (1st Cir. 2004)). In Caban Hernandez v. Phillip Morris USA, Inc., 486 F.3d 1, 7-8 (1st Cir. 2007), the First Circuit Court of Appeals held that, in the context of a motion for summary judgment, where a non-moving party does not admit, deny, or qualify the moving

party's assertions of fact as required by Local Rule 56(c), but instead files an "alternate statement of facts in narrative form," a district court is justified in issuing an order deeming the moving party's assertions of fact admitted.

In this case, plaintiff has failed to comply with requirements of Local Rule 56(c). Although plaintiff admitted several of the assertions contained in defendants' statement of material facts, she did not properly deny or qualify the remaining assertions. (See Docket No. 60 at ¶¶ 1.1-1.4.) Instead of supporting denials of defendants' remaining assertions with specific record citation as required by Local Rule 56, plaintiff merely included a blanket denial for ninety-nine assertions and directed the court to examine a section entitled "Additional Facts." Id. This section, however, is clearly not a separate section of supplemental assertions of fact as contemplated by Local Rule 56. Rather, plaintiff's section styled "Additional Facts" is an attempt to avoid the "rigors that [Local Rule 56] imposes. . . ." Plaintiff ignores her responsibility specifically to address each assertion contained in defendants' statement of material facts, and then launches into her own narrative explanation of the facts in the present case. See Caban Hernandez, 486 F.3d at 7.

Due to the noncompliance with Local Rule 56 as described above, defendants moved to strike plaintiff's statement of material facts. (Docket No. 66) In plaintiff's one-paragraph opposition to

defendants' motion to strike, she does not specifically address her flagrant disregard of the local rule governing summary judgment pleadings. (See Docket No. 82.)  Plaintiff argues that even if the Court were to deem defendants' assertions of fact as admitted, her "Additional Facts" section creates genuine issues of material fact sufficient to survive summary judgment. Id.  In essence, plaintiff concedes that she did not comply with Local Rule 56, but expects the Court to pick through her "Additional Facts" section and sort assertions which are truly additional from those meant to contest defendants' assertions of fact. See id.  The Court will not tolerate plaintiff's wholesale abandonment of the summary judgment procedure established by the Local Rules of the District of Puerto Rico.

The purpose of Local Rule 56 is to create an organized and clear representation of issues of fact which are truly contested between the parties. See Caban Hernandez, 486 at 7-8. Plaintiff has chosen to shirk her responsibility to provide such a representation, and must now face the consequences of that decision. Plaintiff's statement of material facts and accompanying exhibits, (Docket No. 60), are **STRICKEN FROM THE RECORD**.  The assertions contained in defendants' statement of material facts, (Docket No. 53), are **DEEMED ADMITTED** and, in conjunction with their supporting exhibits, will form the **SOLE BASIS** for the factual

background of this opinion and order ruling on defendants' motion
for summary judgment, (Docket No. 50).

### C.   Factual Background

Having stricken plaintiff's statement of facts from the
record, the following factual background is derived from
defendants' statement of uncontested fact and the exhibits attached
to it.

### Lexmark and its Internal Policies

Lexmark markets printers and printing supplies. (Docket
No. 53 at ¶ 1; Docket No. 53-21 at 2)  It operates two business
units in Puerto Rico, with different products, strategy, sales
skills, customer type, operations, and sales models.  (Docket
No. 53 at ¶ 2; Docket No. 53-21 at 2)  One of these business units,
the Consumer Products Division ("CPD"), sells inkjet printers and
supplies to retail consumers.  (Docket No. 53 at ¶ 3; Docket
No. 53-21 at 2)  The other business unit, the Printing Solutions
and Supplies Division ("PSSD"), sells laser printers, toners, and
other printing products to businesses.  (Docket No. 53 at ¶ 4;
Docket No. 53-21 at 2; Docket No. 53-29 at 18-19)

On March 22, 2006, Lopez accepted a written employment
offer from Esther Santiago ("Santiago"), then the General Manager
of Lexmark's Puerto Rico Office.  (Docket No. 53 at ¶ 5; Docket
No. 53-2 at 20-22)  Plaintiff began her employment at Lexmark in
April 11, 2006, as Supplies Manager in the CPD.  (Docket No. 53 at

¶ 6; Docket No. 53-2 at 17, 27-30)  In this position, plaintiff was the sole person responsible for supplies related to the company's inkjet product line.  (Docket No. 53 at ¶ 7; Docket No. 53-2 at 29-30)  Hector Zeno ("Zeno") occupied a similar Supplies Manager position for the Lexmark's laser printer product line.  (Docket No. 53 at ¶ 8; Docket No. 53-2 at 30)

When plaintiff began her employment at Lexmark, her direct supervisor was the CPD Manager, Armando Morales ("Morales"). (Docket No. 53 at ¶ 9; Docket No. 53-2 at 15)  In August of 2006, Ruben Colon ("Colon") became the CPD Manager and plaintiff's direct supervisor.  (Docket No. 53 at ¶ 9; Docket No. 53-2 at 15)  As the CPD Manager, Colon supervised all CPD employees, including plaintiff, Nestor Chinea ("Chinea"), Karelis Correa ("Correa"), Axel Coll ("Coll"), Pedro Santana ("Santana"), Carlos Torres ("Torres"), Zeno, Hector Berrios, Jaime Palmer, and Jennifer Sullivan.  (Docket No. 53 at ¶ 10; Docket No. 53-2 at 165-66; Docket No. 53-27 at 27)  The PSSD Manager was Antonio Diaz ("Diaz"), who had no supervisory relationship with plaintiff. (Docket No. 53 at ¶ 11; Docket No. 53-2 at 37, 316; Docket No. 53-29 at 18-19)  Luis Viloria was the General Manager of Lexmark's Multi Country North Region (the region including Puerto Rico), Colon's direct supervisor, and plaintiff's indirect supervisor. (Docket No. 53 at ¶ 12; Docket No. 53-2 at 140; Docket No. 53-20 at 17-18)

At the beginning of her employment, plaintiff received an annual salary of $75,000. (Docket No. 53 at ¶ 13; Docket No. 53-3) In her first annual performance evaluation, plaintiff was given an overall score of 2 out of 6, with a score of 2 representing a "High Contributor." (Docket No. 53 at ¶ 14; Docket No. 53-28 at 4)  On April 1, 2007, plaintiff received a 6.3% merit salary increase which elevated her annual salary to $79,725. (Docket No. 53 at ¶ 15; Docket No. 53-2 at 23, 28-29; Docket No. 53-4)

Lexmark has implemented policies against unlawful discrimination and harassment, as well as mechanisms to investigate and process complaints of any such activity. (Docket No. 53 at ¶ 16; Docket No. 53-37 at 2)  Lexmark also has a policy forbidding unlawful retaliation. Id.  These policies are distributed electronically to Lexmark employees. Id.  Plaintiff received and read the Lexmark Code of Business Conduct ("CBC") in electronic format. (Docket No. 53 at ¶ 17; Docket No. 53-2 at 128; Docket No. 53-6)  She also stated that she was aware of Lexmark's policy prohibiting illegal discrimination and a phone number employees could call to report violations of that policy. (Docket No. 53 at ¶ 18; Docket No. 53-2 at 129-31; Docket No. 53-6)  Plaintiff was also aware that the CBC required Lexmark employees to report discriminatory or harassing conduct to their manager or the Lexmark Human Resources Department. (Docket No. 53 at ¶ 19; Docket No. 53-2 at 131-34; Docket No. 53-6)

The CBC provides that computers, communications equipment, and other work materials provided by Lexmark are its property and that Lexmark reserves the right to access that property. (Docket No. 53 at ¶ 20; Docket No. 53-2 at 260-61; Docket No. 53-6) Pursuant to this policy, employees are expected to refrain from keeping personal items considered private in any such equipment. Id. The CBC further prohibits the use of Lexmark equipment, systems, telephones, materials, or resources for any non-Lexmark business, with the exception of limited and reasonable use of telephones and computer systems, such as e-mail or internet. (Docket No. 53 at ¶ 21; Docket No. 53-2 at 260-61; Docket No. 53-6) This prohibited conduct includes accessing, storing, or communicating anything inappropriate for a professional business environment, including information that is harassing, discriminatory, or sexually explicit. (Docket No. 53 at ¶ 22; Docket No. 53-2 at 260-61; Docket No. 53-6) Plaintiff was aware of, and agreed with, these policies. (Docket No. 53 at ¶ 20-22; Docket No. 53-2 at 260-61)

Lexmark's Global IT Security Team has also implemented internal security policies in order to protect its electronic and information assets. (Docket No. 53 at ¶ 23; Docket No. 53-24) These security policies incorporate the CBC's prohibition of discrimination, harassment, and improper use of Lexmark property. Id. The security policies specifically prohibit the use of

Lexmark's electronic systems to transmit inappropriate communications, including sexually explicit, profane, obscene, or harassing materials. Id.

Plaintiff was aware that Lexmark had a practice of granting paid vacation to its employees. (Docket No. 53 at ¶ 24; Docket No. 53-2 at 59-62) This paid vacation was not conditioned on the employee's vacation destination, but upon the dates when the employee would be absent. Id.

### Plaintiff's Claims Regarding Other Employees' Activities

Plaintiff claims that in October of 2006 she heard from another Lexmark employee, Zeno, that Morales, Santana, Coll, and Torres went on a weekend trip to visit a brothel in 2006. (Docket No. 53 at ¶ 25; Docket 53-2 at 35-39) She further claims that Zeno and Chinea later told her of a second weekend trip by Zeno, Chinea, Cruz, Coll, and Santana to visit a brothel in 2007. (Docket No. 53 at ¶ 26; Docket 53-2 at 41-45) All of the employees participating in the alleged brothel trips were supervised by Morales, and later by Colon, with the exception of Cruz, who worked in the PSSD division under Diaz. (Docket No. 53 at ¶ 27; Docket No. 53-2 at 36-37) Plaintiff claims to have informed Colon about each of the two trips shortly after hearing of them. (Docket No. 53 at ¶ 28; Docket No. 53-2 at 68-69, 71-72, 77) She claims that these employees used vacation or sick leave to be absent the Friday preceding the weekend of each trip. (Docket No. 53 at ¶ 29; Docket

No. 53-2 at 46-48, 72)  Plaintiff believes that the trips affected her work, but agrees it was those employees' simultaneous absence, not the destination of their trips, that did so.  (Docket No. 53 at ¶ 30-31; Docket No. 53-2 at 21-22, 71, 73, 81)  Plaintiff does not know the name or location of any brothel allegedly visited by said employees, other than stating that the brothels visited were outside Puerto Rico.  (Docket No. 53 at ¶ 32; Docket No. 53-2 at 38-43)

Plaintiff claims Zeno told her that Santana used vacation time in June or early July of 2007, for the purpose of visiting a Colombian prostitute with whom Santana had fallen in love.  (Docket No. 53 at ¶ 33; Docket No. 53-2 at 53-56)  Plaintiff complained to Colon about Santana's vacation because she believed Santana had left without completing his share of work for a joint marketing project.  (Docket No. 53 at ¶ 34; Docket No. 53-2 at 54-56) Plaintiff also informed Colon of what she had heard regarding the circumstances of his trip.  Id.

Plaintiff also claims that Zeno told her that Santana used a company telephone to call the Colombian prostitute during working hours, but admits to having no personal knowledge of the phone call or its circumstances.  (Docket No. 53 at ¶ 35-36; Docket No. 53-2 at 84-87)  When plaintiff informed Colon of the alleged phone calls, Colon told plaintiff that the situation had already been addressed.  (Docket No. 53 at ¶ 37; Docket No. 53-27 at 49-50)

According to Lexmark's mobile phone invoices for August, September, and October of 2006, Santana used a company phone to make personal calls. (Docket No. 53 at ¶ 38; Docket No. 53-27 at 50, 54; Docket No. 53-42 at 31-39)  Colon and Claudia Gonzalez, then the Human Resources Manager for Puerto Rico, met with Santana to discuss the personal calls.  Id.  Santana admitted that the calls were personal, but did not reveal whom he was calling or the purpose of the call.  Id.  He agreed to repay the cost of the personal calls. Id.  Claudia Gonzalez consulted with the then Human Resources Director for Lexmark's Multi Country North region, Karinna Rojas, and both agreed that the appropriate disciplinary action would be to issue a written warning to Santana and demand that he repay Lexmark for the cost of the personal calls.  (Docket No. 53 at ¶ 40; Docket 53-28 at 2, 6; Docket No. 53-42 at 37-38)  They informed the then General Manager, Esther Santiago, of their decision.  Id.

        Plaintiff claims she heard that Coll was harassing another employee, Damaris Torres. (Docket No. 53 at ¶ 41; Docket No. 53-2 at 100-02)  Although she witnessed no harassing behavior personally, plaintiff informed Colon sometime in 2007 about what she had heard.  Id.  Colon responded that he had already spoken with Coll about the situation.  Id.  Colon talked to Coll because an employee who handled phone invoices, Rafael Collazo, informed him that there were numerous calls from Coll to Damaris Torres.

(Docket No. 53 at ¶ 42; Docket No. 53-27 at 61-64)   Colon warned Coll that he did not want any problems with Damaris Torres or anyone else in the office as a result of the office environment or sexual harassment.   Id.   Colon never received any complaints from Damaris Torres and never observed any inappropriate conduct. (Docket No. 53 at ¶ 43-44; Docket No. 53-28 at 2-3.)     Colon concluded that if there was something going on between Damaris Torres and Coll, it was not harassment, and took no disciplinary action against Coll.   Id.   Damaris Torres left the company when her husband was transferred to a job outside Puerto Rico.   Id.

Each time that plaintiff informed her supervisor, Colon, of inappropriate behavior someone had told her about, she also informed the PSSD supervisor, Diaz.   (Docket No. 53 at ¶ 45; Docket No. 53-2 at 75-77)   Diaz did not perceive these occasions as complaints, but rather office gossip because the stories as he heard them related to activities that occurred during employees' personal time.   (Docket No. 53 at ¶ 46; Docket No. 53-29 at 29-35)

In October of 2007, plaintiff informed Viloria that she felt uncomfortable and harassed, and complained about the alleged brothel trips and Colon's inaction related to those trips.   (Docket No. 53 at ¶ 47; Docket No. 53-2 at 140-41)   Plaintiff complained about the brothel trips and Coll's alleged harassment to various persons at Lexmark, including Colon, Diaz, and Viloria, in December of 2006, January of 2007, June of 2007, and October of 2007, but

was not terminated until November 8, 2007, three days after
Lexmark's Human Resources Department received notice that **she** had
sent inappropriate e-mails using Lexmark's facilities. (Docket
No. 53 at ¶ 48; Docket No. 53-2 at 266-68)

> **Plaintiff's Contact with the Human Resources Department**

Claudia Gonzalez ("Gonzalez") was the Human Resources
Manager at the time plaintiff was hired at Lexmark. (Docket No. 53
at ¶ 49; Docket No. 53-2 at 134-36) Plaintiff had contact with
Gonzalez during the hiring process through e-mail and was aware
that she could also be reached by telephone. Id. Gonzalez and
plaintiff also met in person. Id. In December of 2006, plaintiff
participated in a meeting sponsored by Gonzalez. Id. During this
meeting, Gonzalez asked employees about their workplace, their
feelings, if there were any problems, and if the employees had any
solutions to fix potential problems. (Docket No. 53 at ¶ 50;
Docket No. 53-42 at 25-28) The meeting was for employees only, and
managers were not present. Id. Plaintiff met with Gonzalez on
another occasion to discuss her participation in a retirement plan.
(Docket No. 53 at ¶ 51; Docket No. 53-2 at 137) Plaintiff does not
recall having reported any of the issues presented in the complaint
to Gonzalez. (Docket No. 53 at ¶ 52; Docket No. 53-2 at 100-02)

Plaintiff also met William Martin ("Martin"), the Human
Resources Manager assigned to Puerto Rico from May 2007 until
plaintiff's termination, during her participation in a group

meeting sponsored by Martin on October 3, 2007.  (Docket No. 53 at
¶ 53; Docket No. 53-2 at 138-39; Docket No. 53-34 at 9; Docket
No. 53-37 at 2, 15)  Plaintiff does not recall having reported any
of the issues presented in the complaint to Martin.  (Docket No. 53
at ¶ 54; Docket No. 53-2 at 139)  Plaintiff also met with Lexmark
Human Resources Director Karinna Rojas early in her employment with
Lexmark and does not recall having reported any of the issues
presented in the complaint to Karinna Rojas.  (Docket No. 53 at
¶ 55; Docket No. 53-2 at 144-46)

### Plaintiff's Claims Regarding Denial of Promotion

Plaintiff claims that when she was in the process of
being hired at Lexmark, Santiago and Morales mentioned that they
might need someone to manage the CPD division in the future.
(Docket No. 53 at ¶ 56; Docket No. 53-2 at 148)  There was no
specific time line for promotion in plaintiff's job offer.  (Docket
No. 53 at ¶ 57; Docket No. 53-2 at 151-52)  The job offer accepted
by plaintiff included a ninety day probationary period beginning
from the date she was hired, April 10, 2006.  (Docket No. 53 at
¶ 58; Docket No. 53-2 at 150)  On June 30, 2006, Lexmark began
recruiting efforts to fill Morales's position, because he was
leaving Puerto Rico for a position at Lexmark's Lexington office.
(Docket No. 53 at ¶ 59; Docket No. 53-2 at 40; Docket No. 53-37 at
2, 7-14)  Plaintiff did not apply for the position because she
claims Santiago told her she would not be selected.  (Docket No. 53

at ¶ 60; Docket No. 53-2 at 150-51, 161)  On July 27, 2006, Colon
was selected for the CPD Manager position as the best candidate
from several applicants. (Docket No. 53 at ¶ 61; Docket No. 53-37
at 2, 7-14)  At the time Lexmark was seeking a replacement for
Morales, plaintiff had worked for Lexmark for just over two months
and was not eligible to apply for an internal job posting. (Docket
No. 53 at ¶ 62; Docket No. 53-45; Docket No. 53-46)  Lexmark
management believed that plaintiff needed a longer tenure with the
company before promotion and that she should first prove herself in
her position at that time before applying for a promotion. (Docket
No. 53 at ¶ 62; Docket No. 53-43)

        Plaintiff claims that in 2007 Lexmark promoted a male
employee, Raymond Rodriguez ("Rodriguez"), instead of a female
employee, Olga Carrasco ("Carrasco"), to the position of Operations
Manager because Rodriguez was a younger male. (Docket No. 53 at
¶ 63; Docket No. 53-2 at 155-57)  She admits, however, that she
never saw the resume of either Rodriguez or Carrasco. (Docket
No. 53 at ¶ 64; Docket No. 53-2 at 158)  Rodriguez and Carrasco are
the same age and, in fact, Carrasco decided not to apply for the
position because she preferred to remain in the position she then
occupied. (Docket No. 53 at ¶ 65-66; Docket No. 53-37 at 5; Docket
No. 53-40 at 2; Docket No. 53-44)

### Plaintiff's Compensation

Plaintiff claims that she was paid less than Diaz, Colon, and Zeno.  (Docket No. 53 at ¶ 67; Docket No. 53-2 at 162-63)  Diaz and Colon were department heads who each supervised several persons.  (Docket No. 53 at ¶ 68; Docket No. 53-2 at 37, 165-66, 316; Docket No. 53-27 at 27; Docket No. 53-29 at 18-19)  In 2007, plaintiff's monthly salary was $6,250, whereas Zeno's monthly salary was $5,813.  (Docket No. 53 at ¶ 69; Docket No. 53-37 at 5; Docket No. 53-40 at 3)  At that time, plaintiff had the highest salary among employees in the Puerto Rico offices, other than Diaz and Colon.  Id.

### Anecdote of Jairo Fernandez

Jairo Fernandez ("Fernandez"), who began working as General Manager for Lexmark in Puerto Rico in October of 2007, held an "All Company Meeting" at the commencement of his employment.  (Docket No. 53 at ¶ 70; Docket No. 53-22 at 2)  During this meeting, Fernandez told an anecdote in which he was interviewing three candidates for a position.  (Docket No. 53 at ¶ 71; Docket No. 53-22 at 2)  The interviews were delayed and the "least senior" candidate responded to the delay with a more positive attitude than the "most senior" candidate.  Id.  Fernandez claimed that the positive attitude, in conjunction with experience working with complex projects, ultimately led to the "least senior" candidate's selection for the position.  Id.

By "least senior", Fernandez states that he meant "the person with the least experience, which [he] deduced from the fact that he appeared to be the youngest and probably had the shortest professional track." (Docket No. 53 at ¶ 72; Docket No. 53-22 at 2-3)  In relating the anecdote, Fernandez also used the term "young professional".  Id.  During the same anecdote, Fernandez cited Zeno, Correa, and Carrasco as examples of employees with a similar positive attitude.  (Docket No. 53 at ¶ 73; Docket No. 53-22 at 3)  Zeno was then the oldest employee in the company, Correa was the youngest, and Carrasco was born in 1975.  (Docket No. 53 at ¶ 73; Docket No. 53-37 at 5; Docket 53-40 at 2)  Plaintiff felt that the anecdote illustrated a preference within Lexmark for younger males. (Docket No. 53 at ¶ 74; Docket No. 53-2 at 208-211, 214)

### Inappropriate E-mails sent by Plaintiff

At Lexmark, investigations of inappropriate use of their e-mail facilities are usually conducted by the Lexmark's IT Department when it discovers inappropriate e-mail. (Docket No. 53 at ¶ 86; Docket No. 53-35 at 48, 61-62)  Management is not typically involved in any such investigation.  Id.  Lexmark used a tool known as "Mailsweeper" to detect and quarantine any e-mail sent from its e-mail facilities to its competitor, Hewlett Packard. (Docket No. 53 at ¶ 88-89; Docket No. 53-25 at 12-13, 21, 24-25) In early November of 2007, Marshall Kearns ("Kearns"), Senior Manager of Lexmark's IT Operations and Security, was monitoring

"Mailsweeper" in an effort to address storage space issues encountered by Lexmark. (Docket No. 53 at ¶ 87; Docket No. 53-25 at 9-10, 13; Docket No. 53-23 at 21-23)  During the course of this monitoring, Kearns came across three e-mails sent by plaintiff to recipients at Hewlett Packard which he found to be inappropriate. (Docket No. 53 at ¶ 90; Docket No. 53-25 at 12-15)  Kearns consulted with John Turner ("Turner"), a Lexmark Global IT Security Analyst, who agreed that the e-mails were inappropriate. (Docket No. 53 at ¶ 91; Docket No. 53-23 at 34)  On November 5, 2007, Kearns reported the inappropriate e-mails to Rojas. (Docket No. 53 at ¶ 92; Docket 53-25 at 15-16, 21-24; Docket 53-34 at 12-13) Rojas and Kearns then informed Martin of the same. Id. Kearns was asked to find other e-mails intercepted by "Minesweeper" sent by plaintiff to recipients at Hewlett Packard and reported two more e-mails as a result of the investigation. (Docket No. 53 at ¶ 93; Docket No. 53-25 at 16, 21, 24; Docket 53-34 at 13, 23; Docket No. 53-37 at 3-4)  Turner then accessed plaintiff's e-mail account and copied the contents of her mailbox onto a compact disc, which he mailed to Martin. (Docket No. 53 at ¶ 94; Docket No. 53-23 at 11-12, 16, 21, 23, 32-33)

        Eight e-mails considered to be inappropriate, dated from October 16, 2007 to November 1, 2007, sent by plaintiff to recipients at both Hewlett Packard and Lexmark, were found in plaintiff's e-mail account. (See Docket No. 53 at ¶¶ 78-85, 90)

The e-mails contain videos and powerpoint presentations, including: (1) a message in which a woman describes a tree full of penises she is trying to grab, with an attached image of a tree with protuberances resembling male genitalia; (2) a powerpoint presentation with a slide entitled "How to prevent a Jehovah's witness from knocking at your door" and featuring an image of a door knocker in the shape of a nude man with disproportionately large testicles; and (3) a message with the subject line "I will send this to your wives, surely they have never seen anything like this," containing an attachment which depicts a nude man and woman in various sexual positions.  (Docket No. 53 at ¶¶ 75-85; Docket No. 53-31 at 2-3; Docket No. 53-37 at 3-4; Docket No. 53-38 at 12; Docket No. 53-39 at 6-15)

After independently reviewing the e-mails sent by plaintiff, both Rojas and Martin concluded that they contained inappropriate, sexually explicit information, which violated the CBC.  (Docket No. 53 at ¶ 95; Docket No. 53-34 at 13-14)  Martin then confirmed in Lexmark's records that plaintiff had received a copy of the CBC.  (Docket No. 53 at ¶ 96; Docket No. 53-34 at 17-19)  Martin also confirmed with Fernandez that plaintiff was working on the dates when the e-mails were sent.  (Docket No. 53 at ¶ 97; Docket No. 53-22 at 3; Docket No. 53-34 at 17-19, 24; Docket No. 53-37 at 5)  Martin was also aware that each Lexmark e-mail user has a unique identification assigned and that the sender of

each of the inappropriate e-mails corresponded with plaintiff's identification. (Docket No. 53 at ¶ 98; Docket No. 53-34 at 17-19) Based on this information, Martin concluded that plaintiff had indeed sent the inappropriate messages found in her e-mail account addressed to recipients at Lexmark and Hewlett Packard. (Docket No. 53 at ¶ 99; Docket No. 53-34 at 23-24)

Martin then determined that, based on Lexmark's zero tolerance policy on the transmission of sexually inappropriate materials through its e-mail facilities, the proper course of action was to terminate plaintiff. (Docket No. 53 at ¶ 100; Docket No. 53-34 at 9, 25, 28-32, 35-38) He informed Rojas, who agreed with Martin's decision to terminate plaintiff. Id. Martin then informed that region's Vice President, Ronaldo Foresti, of the situation and his decision to terminate plaintiff. Id. Martin also informed Viloria and Fernandez. Id. Because is customary at Lexmark for this type of disciplinary decision to be taken by the Human Resources Department and senior managment, neither Viloria nor Fernandez participated in the decision to terminate plaintiff. Id.; (Docket No. 53 at ¶ 101; Docket No. 53-35 at 36; Docket No. 53-42 at 38-39)

Prior to the incident regarding plaintiff, Martin had not received any other notifications about inappropriate e-mails from any other person in Lexmark's Puerto Rico office. (Docket No. 53 at ¶ 102; Docket No. 53-34 at 12) Between 2003 and 2007, Martin

participated in two investigations that resulted in the termination
of two Lexington-based Lexmark employees due to their transmission
of e-mails with sexually inappropriate content.  (Docket No. 53 at
¶ 103; Docket No. 53-35 at 33-34)  Martin stated that, between 2006
and 2008, there were at least four cases of inappropriate internet
usage by Lexmark employees, which included viewing nude images,
sexual acts, or sexually explicit images over the internet.
(Docket No. 53 at ¶ 104; Docket No. 53-37 at 5; Docket NO. 53-43)
Rojas was involved in a similar investigation at Lexmark's Coral
Gables office.  Id.  None of these incidents involved the use of
Lexmark's e-mail system, and all of the employees involved were
male.  Id.  Four of the  employees investigated for inappropriate
internet usage were terminated, and the other was placed on notice
because the circumstances of the case indicated that he had
accidentally accessed sexually explicit material while conducting
an otherwise legitimate internet search.  Id.

         **Plaintiff's Termination**

         Martin traveled to Lexmark's Puerto Rico office in order
to conduct the termination meeting in person.  (Docket No. 53 at ¶
105; Docket No. 53-35 at 35.)  On November 8, 2007, Martin
conducted the termination meeting with plaintiff in Fernandez's
office, with Fernandez present.  (Docket No. 53 at ¶ 106; Docket
No. 53-2 at 219-220; Docket No. 53-35 at 42-44.)  Martin informed
plaintiff that he had received information that she had violated

the CBC by sending e-mails with inappropriate sexual content using the company's e-mail system.  <u>Id.</u>  Martin showed plaintiff copies of the inappropriate e-mails without attachments and she recognized herself as the sender and her friends as recipients.  (Docket No. 53 at 107; Docket No. 53-2 at 225-227, 235, 238, 242, 244, 247, 252; Docket No. 53-35 at 43-44)  Although plaintiff claims that she does not recall having sent these e-mails, she does not deny sending them or any other inappropriate e-mails.  (Docket No. 53 at ¶ 108; Docket No. 53-2 at 257-58)  Plaintiff did not mention any names at the termination meeting of other employees engaging in conduct similar to her own.  (Docket No. 53 at ¶ 109; Docket No. 53-35 at 47)

        Prior to the termination meeting, Martin had not received any complaints about employees visiting brothels, any harassment by Coll, any harassment toward plaintiff, or any inappropriate e-mails from other Lexmark employees in the Puerto Rico office.  (Docket No. 53 at ¶ 110; Docket No. 53-35 at 49)  Plaintiff states that she does not recall having received an e-mail on her personal e-mail account from her Lexmark e-mail account, even though one of the inappropriate e-mails was copied to her personal e-mail address.  (Docket No. 53 at ¶ 111; Docket No. 53-2 at 261-63)  She also stated, however, that if she had received an e-mail from her Lexmark e-mail account on her personal e-mail account which she did not send, she would have reported it to Lexmark.  <u>Id.</u>

### Security Measures in the Lexmark E-mail System

Lexmark strictly controls access to its employees' e-mail accounts. (Docket No. 53 at ¶ 112; Docket No. 53-23 at 11-13; Docket No. 53-34 at 24) Access to an employee e-mail account is limited to those persons on a specific access control list ("ACL"). Id. Kearns could not access plaintiff's e-mail account because he was not on the ACL for that account. Id. Turner did have access as an administrator, however, and was therefore able to enter plaintiff's e-mail account using his administrator identification and copy the contents of plaintiff's mailbox to a CD for the Human Resources Department. Id.

Lexmark uses the program Lotus Notes for its e-mail system. (Docket No. 53 at ¶ 113; Docket No. 53-23 at 14, 16; Docket No. 53-24 at 2) Each Lexmark user is assigned an e-mail address and a mailbox for that address. Id. To access his or her mailbox, each employee has a unique user identification file. Id. Each identification file has encrypted information which is stored on the local drive of the employee's computer. Id. To send an e-mail using a Lexmark account, an employee must be logged in to his or her mailbox and must have opened his or her particular identification file, which is not shared among employees. Id. Turner confirmed that the inappropriate e-mails in question were, in fact, sent from plaintiff's mailbox. (Docket No. 53 at ¶ 114; Docket No. 53-24 at 2)

### Examples of Other Non-work Related E-mails Collected by Plaintiff after her Termination

Plaintiff has collected various e-mails which she considers to be inappropriate material sent by employees who were not terminated. (Docket No. 53 at ¶¶ 115-120; Docket 53-2 at 170-74, 185-96, 199, 201-207) There is no indication, however, that any of these e-mails was reported to senior management, the IT Department, or the Human Resources Department at Lexmark. <u>Id.</u> None of the e-mails was sent to recipients at Hewlett-Packard, and therefore was not intercepted by "Mailsweeper". <u>Id.</u> With the exception of one of the e-mails, plaintiff did not see these e-mails until after her termination from Lexmark. <u>Id.</u>

### Demographic Information about Lexmark

At the time of plaintiff's termination, Fernandez was 41 years old, Viloria was 42 years old, Ronaldo Foresti was 55 years old, Rojas was 38 years old, Martin was 36 years old, and about 29% of the Puerto Rico office was within the age protected by the ADEA. (Docket No. 53 at ¶ 121; Docket No. 53-37 at 5-6; Docket No. 53-40 at 2) On February 25, 2008, Fernandez hired Laura Gonzalez to replace plaintiff. (Docket No. 53 at ¶ 122; Docket No. 53-37 at 6; Docket No. 53-40 at 2) Laura Gonzalez was born on November 18, 1966. <u>Id.</u>

## II.  Legal Analysis

### A.  Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  The rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the Court's denial of the motion for summary judgment.  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.  See Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine." Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. Id. at 252. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

**B.   Failure to Exhaust Administrative Remedies**

"In states which have enacted employment discrimination laws like Puerto Rico ("deferral states"), plaintiffs must file

charges of unlawful . . . discrimination [based on a protected category] within 300-days after the alleged unlawful employment practice occurred." Portugues-Santa v. B. Fernandez Hermanos, Inc., 614 F.Supp.2d 221, 232-33 (D.P.R. 2009) (citing 42 U.S.C. § 2000e-5(e)(1); Fontanez-Nuñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006); American Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 122 (1st Cir. 1998); Lawton v. State Mut. Life Assurance Co. of America, 101 F.3d 218, 221 (1st Cir. 1996); Cardona v. Aramark Services of Puerto Rico, Inc., 9 F.Supp.2d 92, 97-98 (D.P.R. 1998)). A failure to promote is considered a discrete act "constitut[ing] a separate actionable 'unlawful employment practice.'" National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). Accordingly, to establish an actionable claim based on a failure to promote, a plaintiff must have filed administrative charges based on that unlawful employment action within 300 days of its occurrence. See id.; Portugues-Santa, 614 F.Supp.2d at 232-33.

Plaintiff alleges that despite her qualifications to be promoted to "higher supervisory positions," Lexmark filled those positions with younger, less-experienced males. (Docket No. 1 at ¶ 3.9) Lexmark argues that plaintiff has not exhausted her administrative remedies because any instance of failure to promote was a "discrete act" of discrimination and was not included in a timely administrative complaint. (Docket No. 50 at 15-16) Having examined the evidence in the record, Lexmark appears to be correct.

        In plaintiff's deposition, she refers to one instance when she was allegedly passed over for a promotion.[3]  (Docket No. 53-2 at 148)  Plaintiff identifies the selection of Colon to replace Morales instead of her, which occurred on July 27, 2006.  Id.; (Docket No. 53-37 at 2, 7-14)  In order to bring a claim based on this alleged failure to promote, plaintiff needed to file administrative charges regarding the incident within 300 days of its occurrence on July 27, 2006.  Plaintiff did not file her administrative complaint until December 19, 2007, more than one year after Colon was selected for Morales's position.  (Docket No. 53 at 124; Docket No. 53-47)  Given that plaintiff clearly failed to comply with the proper administrative procedures regarding Colon's selection as CPD Manager, her discrimination claim based on that action is **DISMISSED WITH PREJUDICE.**

## C.   **Direct Evidence of Discrimination in Plaintiff's Termination**

        Plaintiff also alleges age and gender discrimination claims based on the termination of her employment at Lexmark. (Docket No. 1 at ¶¶ 4.2, 5.3)  The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with

---

        [3] Plaintiff also claims that Carrasco, a female, was passed over for a management position in favor of Rodriguez, a male. (Docket No. 53-2 at 155-158.)  Even assuming that this occurred, it has no relevance to plaintiff's failure to promote claim because the alleged adverse employment action would have been taken against Carrasco, not plaintiff.  See id.

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."   29 U.S.C. § 623(a)(1).  Title VII of the Civil Rights Act of 1964 prohibits the same type of discrimination "because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. 2000e-2(a)(1).  The trial court must evaluate the evidence presented as a whole in order to determine if the evidence, whether direct or circumstantial, is sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by a discriminatory animus based on age.  See Hidalgo v. Overseas Condado, 120 F.3d 328, 335 (1st Cir. 1997) (citing LeBlanc v. Great American Ins. Co., 6 F.3d at 843).

     A plaintiff may prove unlawful employment discrimination by using direct evidence.  See Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000).  "Direct evidence is evidence which, in and of itself, shows discriminatory animus."  Jackson v. Harvard University, 900 F.2d 464, 467 (1st Cir. 1990); Mandavilli v. Maldonado, 38 F.Supp.2d 180, 192 (D.P.R. 1999).  "'[S]tray workplace remarks,' as well as statements made either by nondecisionmakers or decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus."  Gonzales v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002).  Direct evidence of discrimination "also does not

Civil No. 08-1521 (FAB)                                           33

include statements capable of being interpreted as both discriminatory and benign." Rios-Jimenez v. Principi, 520 F.3d 31, 40 (1st Cir. 2008). Statements as direct evidence cannot be "inherently ambiguous" and must give a "high degree of assurance" that discrimination was the reason for the adverse employment action. Patten v. Wal-Mart Stores East, Inc., 300 F.3d 21, 25 (1st Cir. 2002) (citing Fernandes v. Costa Bros. Masonry, 199 F.3d 572, 583 (1st Cir. 1999)).

        The only incident in the record that could be interpreted as expressing a preference based on age or gender is the anecdote told by Fernandez at the "All Company Meeting" held in October of 2007.  (See Docket No. 53-22)  This incident, however, is not sufficient to constitute direct evidence of discriminatory animus. Fernandez, while present at the November 8, 2007, termination meeting, did not participate in the decision to terminate plaintiff. (Docket No. 53-2 at 219-220; Docket 53-35 at 36, 42-44; Docket 53-42 at 38-39)  Furthermore, Fernandez's anecdote could be interpreted as emphasizing the importance of a positive attitude, rather than plaintiff's interpretation that it expressed a preference for younger male employees.  (See Docket 53-2 at 208-211, 214; Docket No. 53-22)  This benign interpretation seems more plausible considering that, at the same meeting, Fernandez referred to a male employee within the ADEA protected age and two female employees as examples of similar positive attitudes.  (See Docket

No. 53-22 at 3; Docket No. 53-37 at 5; Docket No. 53-40 at 2)   In light of these facts, there does not appear to be any evidence on the record that gives a "high degree of assurance" that discriminatory animus was behind the decision to terminate plaintiff.  See, e.g., Patten, 300 F.3d at 25.

### D.   *Prima Facie* Case under the ADEA Based on Plaintiff's Termination

When relying on circumstantial evidence to prove employment discrimination, a plaintiff must make a *prima facie* case according to the McDonnell-Douglas burden-shifting framework. Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003).   To establish a *prima facie* case under the ADEA, the employee must show:  (1) that he or she is over forty years of age; (2) that his or her job performance was satisfactory and met the employer's legitimate expectations; (3) that he or she suffered an adverse employment action; and (4) that the defendant "sought a replacement with roughly equivalent job qualifications, thus revealing a continued need for the same services and skills."  See Gonzalez v. El Dia, Inc., 304 F.3d 63, 68 (1st Cir. 2002); Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 25 (1st Cir. 1997); Mesnick v. General Electric Co., 950 F.2d 816, 823 (1st Cir. 1991).   The required *prima facie* showing is not especially burdensome.  See Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995); Sanchez v. P.R. Oil Co., 37 F.3d 712, 719 (1st Cir.

1994), Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 n. 4 (1st Cir. 1994).

The McDonnell Douglas *prima facie* case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996) (citing Teamsters v. United States, 431 U.S. 324, 358 (1977)).  In the context of an ADEA discriminatory discharge claim, this means that a plaintiff must show that he or she was replaced by someone with "qualifications similar to [the plaintiff's] own," who is also "substantially younger than the plaintiff" in order to satisfy the fourth element of the *prima facie* case. O'Connor, 517 U.S. at 313; Williams v. Raytheon Co., 220 F.3d 16, 20 (1st Cir. 2000); Connell v. Bank of Boston, 924 F.2d 1169, 1173 (1st Cir. 1991).  The First Circuit Court of Appeals has held "that a three year age difference is too insignificant to support a prima facie case of age discrimination." Williams, 220 F.3d at 20.

In this case, plaintiff was replaced by Laura Gonzalez. (Docket No. 53-37 at 6; Docket No. 53-40 at 2)  Laura Gonzalez was born on November 18, 1966. Id.  Plaintiff was born on April 22, 1964.  (Docket No. 1 at ¶ 3.1)  This makes the difference between their ages approximately two years and seven months, which is insufficient to establish a *prima facie* case of discrimination under the ADEA. See Williams, 220 F.3d at 20.  Accordingly,

plaintiff's ADEA claim based on her termination is **DISMISSED WITH PREJUDICE.**

### E.   *Prima Facie* Case under Title VII based on plaintiff's termination

Under Title VII, the elements of the McDonnell-Douglas *prima facie* case remain the same as under the ADEA, with the exception that instead of showing that he or she is over the age of forty, a plaintiff must show that he or she is a member of one of the relevant protected classes, e.g., race, sex, national origin, color, or religion. See Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000). Establishing a *prima facie* case gives rise to an inference of discrimination. Mesnick, 950 F.2d at 823. While the burden of persuasion remains at all times with the plaintiff, the *prima facie* case shifts the burden of production to the employer, who must then articulate a legitimate non-discriminatory reason for the adverse employment action. Id. Articulating a legitimate, nondiscriminatory reason "entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." Id. (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); Medina-Muñoz, 896 F.2d at 9. If the employer meets this limited burden, the presumption created by the *prima facie* case disappears and the plaintiff "must adduce sufficient . . . evidence that [membership

in a protected class] was a motivating factor in the challenged employment action." Zapata-Matos v. Reckitt & Coleman, Inc., 277 F.3d 40, 45 (1st Cir. 2002). To show that membership in a protected class was a motivating factor, a plaintiff must show that the employer's reason is pretext, thus allowing the factfinder to infer "discriminatory animus" behind the challenged employment action. Gonzalez, 304 F.3d at 69. "It is not enough for a plaintiff to merely impugn the veracity of the employer's justification, he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's'" discriminatory motive. Mesnick, 950 F.2d at 824 (quoting Medina-Muñoz, 896 F.2d at 9).

Lexmark does not dispute that plaintiff can establish a prima facie case of sex discrimination with regard to the termination of her employment, but argues that plaintiff cannot show that its nondiscriminatory reason for her termination is pretext for discrimination. (Docket No. 50 at 8-15) Lexmark states that it terminated plaintiff pursuant to its policy prohibiting the transmission of sexually explicit material through its e-mail system. Id. Ample evidence in the record supports this stated reason, reflecting that several e-mails with such prohibited conduct were sent from plaintiff's e-mail account to recipients at Lexmark and its competitor, Hewlett Packard. (See Docket No. 53 at ¶¶ 75-85; Docket No. 53-31 at 2-3; Docket No. 53-37 at 3-4; Docket

No. 53-38 at 12; Docket No. 53-39 at 6-15)  Some of these e-mails
were intercepted by Lexmark's IT Department through the use of the
"Mailsweeper" filter, which was in place to detect and quarantine
any e-mails sent from the Lexmark e-mail system to its competitor,
Hewlett Packard.   (Docket  No.  53-25  at  12-15)    After  an
investigation conducted by Lexmark's IT Department, Lexmark's Human
Resources Department reviewed the e-mails and determined that they
were in violation of the CBC.  (Docket No. 53-34 at 13-14)  Lexmark
strictly limits access to employee e-mail accounts and provides
employees with unique identification profiles.  (Docket No. 53-23
at 11-13; Docket No. 53-34 at 24)  Plaintiff was present at work on
the dates of each e-mail intercepted by the "Mailsweeper" filter
and did not deny having sent those e-mails during the November 8,
2007, termination meeting.  (Docket No. 53-22 at 3; Docket No. 53-2
at 257-58)

     Plaintiff points to examples of e-mails with sexually
explicit content sent by other Lexmark employees who were not
terminated and argues that this demonstrates an inconsistency in
the application of Lexmark's policy against transmitting such
material through their e-mail system.   (Docket  No.  59  at  7)
Although it is possible to show pretext "by showing 'weaknesses,
implausibilities, inconsistencies, incoherencies, or contradictions
in the employer's proffered legitimate reasons,'" there is not
sufficient evidence in this case for a reasonable factfinder to

"'infer that the employer did not act for the asserted non-discriminatory reasons.'"   See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) (quoting Hodgens v. General Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)). Plaintiff's inappropriate e-mails were detected by Lexmark's IT department and reported to Lexmark's Human Resources Department as a result the interception of a few of those e-mails by the "Minesweeper" filter and the resulting investigation of her e-mail account. (Docket No. 53-25 at 12-15)   Lexmark's "Minesweeper" filter is designed to intercept only those e-mails which include recipients at its competitor, Hewlett Packard.   Id.   None of the other Lexmark employees' e-mails cited by plaintiff were sent to recipients at Hewlett Packard and intercepted by "Minesweeper" or otherwise reported to Lexmark's IT Department or Human Resources Department.   (Docket No. 53 at ¶¶ 115-120)   The Lexmark Human Resources Manager assigned to Puerto Rico, Martin, stated that he had received no other complaints of inappropriate e-mails in the Puerto Rico office, but had participated in two investigations of that type of behavior in the Lexington office, both of which resulted in termination. (Docket No. 53-34 at 12; Docket No. 53-35 at 33-34)   Given that plaintiff's e-mails were sent under particular circumstances that resulted in detection and investigation, a reasonable factfinder could not find Lexmark's nondiscriminatory reason for her termination pretextual on the

basis of the other, unreported inappropriate e-mails cited by plaintiff.

Plaintiff makes a similar argument based on the personal phone calls made by Santana using Lexmark's phones. (Docket No. 59 at 6)  Plaintiff claims that Santana misused company property and was not disciplined in the same manner as plaintiff.  Although plaintiff claims that Zeno told her that Santana was calling a prostitute in Colombia, there is no admissible evidence as to who Santana was calling or the purpose of the phone calls.[4] (See Docket No. 53-2 at 84-87)  Colon and Claudia Gonzalez addressed the issue with Santana due to the appearance of the calls on the Lexmark's mobile phone invoices. (Docket No. 53-27 at 50, 54; Docket No. 53-42 at 31-39)  Those invoices did not reveal any information, however, other than that the calls were made. (Docket No. 53 at ¶ 39; Docket No. 53-2 at 89-90)  Santana admitted to making personal calls, but did not reveal any other information. (Docket No. 53-42 at 39)  Unlike plaintiff's e-mails, where copies of the messages and their attachments were readily available, the content of Santana's phone calls was not available to Lexmark's Human Resources Department.  Given the information available to the

---

[4] Zeno's description of Santana's phone calls is clearly an out of court statement offered to prove the truth of the matter asserted, i.e., that Santana did indeed call a prostitute in Columbia using a Lexmark phone.  It is therefore inadmissible hearsay and cannot serve to create genuine issues of material fact on summary judgment.  See Fed.R.Evid. 801-802; Noviello v. City of Boston, 398 F.3d 76, 84-85 (1st Cir. 2005).

Lexmark Human Resources Department regarding the circumstances of plaintiff's inappropriate e-mails and Santana's personal calls, no reasonable factfinder could rely on this evidence to find Lexmark's nondiscriminatory reason pretextual.

Even if plaintiff can establish a *prima facie* case of sex discrimination, Lexmark has countered with a nondiscriminatory reason for her termination that draws clear support from the record in the present case.   Plaintiff has provided no evidence which could allow a reasonable factfinder to conclude that Lexmark's reason for her termination is pretext for sex discrimination. Thus, plaintiff has failed to establish genuine issues of material fact sufficient for her sex discrimination claim based on her termination to survive summary judgment.   That claim is accordingly **DISMISSED WITH PREJUDICE.**

> **F.   Retaliation Claims**

Both the ADEA and Title VII prohibit an employer from discriminating against an individual because he or she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the ADEA or Title VII, respectively.   42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).   To establish a *prima facie* case of retaliation under either statute, a plaintiff must show that he or she:   (1) engaged in protected conduct; (2) suffered an adverse employment action; and (3) that the adverse employment action was causally connected to the

protected conduct.  *Noviello*, 398 F.3d at 88 (citing *Dressler v. Daniel*, 315 F.3d 75, 78 (1st Cir. 2003); *Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 425 F.3d 67, 84 (1st Cir. 2005) (citing *Mesnick*, 950 F.2d at 827.  Once a plaintiff satisfies the elements of the *prima facie* case of retaliation, a burden of production falls on the employer to put forth a legitimate, nondiscriminatory reason for the adverse employment action.  *Ramirez Rodriguez*, 425 F.3d at 84; *Valentin-Almeyda*, 447 F.3d at 95.  The ultimate burden of persuasion, however, remains with the plaintiff, and he or she must show that the employer's nondiscriminatory reason is a pretext for retaliatory discrimination.  *Id.*

        Plaintiff alleges that her termination from employment at Lexmark was retaliation for reporting instances of sexual misconduct or harassment by fellow employees.  (Docket No. 1 at ¶¶ 4.2, 5.3)  Even assuming that plaintiff can make a *prima facie* case of retaliation, as discussed above, she cannot demonstrate that Lexmark's nondiscriminatory reason for her termination is pretext for any unlawful motive.  For the same reasons that her Title VII discrimination claim regarding her termination fails, plaintiff's Title VII and ADEA retaliation claims based on the same employment action are **DISMISSED WITH PREJUDICE.**

### G.   Hostile Work Environment Claim

The protection against discrimination in employment provided by Title VII has been expanded to areas beyond strictly "economic" and "tangible discrimination" to situations where "sexual harassment [is] so 'severe or pervasive' as to 'alter the condition [of the victim's] employment and create an abusive working environment.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); Collazo v. Nicholson, 535 F.3d 41, 44-45 (1st Cir. 2008); Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006); Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006); Noviello, 398 F.3d at 92.  An abusive work environment is created "'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'"  Acevedo Vargas v. Colon, 68 F.Supp.2d 80, 92 (D.P.R. 1999) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 20 (1993)).

To sustain a hostile work environment claim, a plaintiff must prove:  "(1) that she . . . is a member of a protected class; (2) that she was subjected to unwelcome . . . harassment; (3) that the harassment was based upon [membership in the protected class]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an

abusive work environment; (5) that [the] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) some basis for employer liability has been established." O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (citing Faragher, 524 U.S. at 787-89; Harris, 510 U.S. at 20-23; Meritor, 477 U .S. at 65-73).  Hostile work environment claims generally center on the severity and pervasiveness of the objectionable conduct and whether that conduct was both objectively and subjectively offensive.  Id.

        In Harris, the Supreme Court noted that the test for proving a hostile work environment "is not, and by its nature cannot be, . . . mathematically precise." Harris, 510 U.S. 17, 22 (1993).  To determine whether an environment is sufficiently "hostile" or "abusive," a court must examine the totality of the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.  "'Simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment. Faragher, 524 U.S. at 788 (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 82 (1998)).  "[The Court's] function is one of screening, that is, to determine whether, on

particular facts, a reasonable jury could reach such a conclusion."
Noviello, 398 F.3d at 94 (citing Rivera-Rodriguez v. Frito Lay
Snacks Caribbean, 265 F.3d 15, 24 (1st Cir. 2001).

Plaintiff has failed to provide evidence of any
discriminatory harassment that would serve as the basis for a
hostile work environment claim and instead relies primarily on
rumors and speculation.  Plaintiff argues that Lexmark's
"acquiescence of employees [sic] trips to brothels . . . resulted
upon [sic] a sexually charged environment created at the office."
(Docket No. 59 at 11)  There is no evidence, however, of the
"sexually charged" effects on the Lexmark Puerto Rico office that
plaintiff describes.  Even disregarding the questionable
admissibility of plaintiff's claim that Zeno and Chinea informed
her of the illicit circumstances of these employees' use of paid
leave time, plaintiff agreed in her deposition that it was not the
alleged sexual nature of the trips that affected her work, but
rather the simultaneous absence of a number of employees in her
division.  (Docket No. 53-2 at 81)  Furthermore, plaintiff admits
that she was informed of these trips on only two occasions and that
any sexually inappropriate conduct occurred outside of the Lexmark
Puerto Rico office.  Id. at 38-39, 72.

Plaintiff also points to the alleged harassment of
Damaris Torres by Coll.  (Docket No. 59 at 5-6)  Again, setting
aside the questionable admissibility of what another employee told

plaintiff regarding the relationship between Damaris Torres and Coll, plaintiff has provided no evidence as to how this alleged harassment affected her.  Plaintiff admitted that she had no personal knowledge of any harassment by Coll, and it is clear that, even if Coll did harass someone, plaintiff has not established a negative impact on herself as a result of any such harassment. (Docket No. 53-2 at 100-02)

        Plaintiff has failed to produce any evidence of severe or pervasive sexual harassment directed toward herself.  The first example of inappropriate conduct cited by plaintiff allegedly occurred on two occasions outside Lexmark's Puerto Rico office and, by plaintiff's own admission, only affected her work due to some employees' absence, regardless of the reason for that absence. Plaintiff's second example of inappropriate conduct was clearly not directed toward plaintiff, and, if it happened, never occurred in plaintiff's presence.  Given this lack of evidence, no reasonable factfinder could find that plaintiff suffered the type of "discriminatory intimidation, ridicule, and insult" necessary to create a hostile work environment.  See Harris, 510 U.S. at 20. Plaintiff's hostile work environment claim pursuant to Title VII is therefore **DISMISSED WITH PREJUDICE.**

        **H.   Equal Pay Act Claim**

        The EPA prohibits employers from discriminating "between employees on the basis of sex by paying wages to employees . . . at

a rate less than the rate at which he pays wages to employees of
the opposite sex . . . for equal work on jobs . . . requir[ing]
equal skill, effort, and responsibility, and which are performed
under similar working conditions." The EPA is concerned with wage
discrimination within the same "establishment", which means "a
distinct physical place of business rather than to an entire
business or 'enterprise' which may include several separate places
of business." 29 C.F.R. § 1620.9; see Ingram v. Brink's, Inc., 414
F.3d 222, 232 (1st Cir. 2005). In order to establish a *prima facie*
case of wage discrimination under the EPA, a plaintiff must show
"that the employer paid different wages to specific employees of
different sexes for jobs performed under similar working conditions
and requiring equal skill, effort and responsibility." Ingram, 414
F.3d at 232. "Equal responsibility", in the context of the EPA,
"concern[s] . . . the degree of accountability required in the
performance of the job, with the emphasis on the importance of the
job obligation." 29 C.F.R. § 1620.17; see id.

       In this case, plaintiff cannot establish a *prima facie*
case of wage discrimination. As demonstrated by the evidence in
the record, plaintiff was the highest paid employee in Lexmark's
Puerto Rico office other than Colon and Diaz prior to her
termination. (Docket No. 53-37 at 5; Docket No. 53-40 at 3) Colon
was in charge of Lexmark's CPD division in Puerto Rico, supervising
many employees, including plaintiff. (Docket No. 53-2 at 37, 165-

66, 316; Docket No. 53-27 at 27; Docket No. 53-29 at 18-19)   Diaz was in charge of Lexmark's PSSD division in Puerto Rico, supervising several employees within that division.   Id.   There is no indication in the record that plaintiff supervised any Lexmark employees.

Given the factual circumstances of this case, there is no evidence of any male employee in Lexmark's Puerto Rico Office with responsibilities equal to plaintiff who received higher compensation than she did.   In fact, the male employee in the PSSD division who held a position analogous to plaintiff, Zeno, was paid less than plaintiff at the time of her employment with Lexmark. (Docket No. 53-37 at 5; Docket No. 53-40 at 3)   Accordingly, plaintiff cannot establish the necessary elements of a *prima facie* case under the EPA and this claim is therefore **DISMISSED WITH PREJUDICE.**

I.    **Claims Under Puerto Rico Law**

Plaintiff alleges claims pursuant to Law 100 and articles 1802 and 1803.   (Docket No. 1 at ¶¶ 8.1-8.4, 9.1-9.3)   Because no federal claims remain to ground supplemental jurisdiction over Commonwealth claims in this case, plaintiff's claims pursuant to Law 100 and articles 1802 and 1803 are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons expressed above, the Court **GRANTS** both the motion to strike, (Docket No. 66), and the motion for summary judgment, (Docket No. 50).  Plaintiff's remaining federal claims against Lexmark are **DISMISSED WITH PREJUDICE.**  Plaintiff's remaining supplemental claims against all defendants are **DISMISSED WITHOUT PREJUDICE.**

Judgment shall be entered in accordance with this Opinion and the Opinion at Docket No. 40.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, January 21, 2010.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE